Our second case of the day is Peters Broadcast Engineering v. PEM Consulting Group. Mr. Spryer, wait a little moment until the rustling has died down. Of course, if they knew what this case was about, they would all be staying. Okay, Mr. Spryer. Good morning, your honor. May it please the court. Your honor, our appeal today is based upon three primary components. Number one, it is our position that the order of the district court granting summary judgment to Appalese, PEM Consulting, and Pyramid, and Phil Miller should be reversed because Peters Broadcast Engineering filed an eight-count amended complaint against these defendants. In the order granting summary judgment to the defendants on the amended complaint, the district court only dealt with seven of the eight claims. There was a claim for fraudulent inducement, which was count four of the complaint that the district court did not deal with at all. It didn't dismiss or overrule the motion for summary judgment in relation to that claim. It merely ignored that claim. So number one, the dismissal of the case did not address every claim raised by the plaintiff. The fraudulent inducement claim was not dealt with at all, and on that ground alone, the district court should be reversed. Secondly, the district court, instead of according the inferences arising from the facts alleged by the plaintiff, made decisions deciding which of the facts the district court decided to approve. The third issue is the district court focused entirely in its opinion on whether or not there was a contract between the parties which gave the defendants the status of a subcontractor. What the district court ignored was that the claim, the gravamen of the amended complaint, was that there was detrimental reliance on behalf of Peters Broadcast Engineering, which gave rise to an amended, an implied contract, I should say, that was breached. Peters Broadcast Engineering relied to its detriment and altered its position based upon fraudulent and negligent representations made to it by the defendants. Specifically, Your Honor, Peters Broadcast Engineering is a 40-year-old small radio broadcast engineering company based in Fort Wayne, Indiana. In 2019, by virtue of its reputation within the industry, Crown Castle approached Peters in connection with its requirement to construct sales sites at 33 locations in Indiana and for Peters Broadcasting to be a lead contractor on that construction. Those, the opportunity presented to Mr. Peters and Peters Broadcast Engineering was such that not only did they have the opportunity to work on these 33 sites, because this opportunity was extended in connection with the 5G rollout, there was an opportunity for Peters Broadcast Engineering to work on sales sites indefinitely, practically, all over the United States. At first, however, they were asked by Crown Castle to work on 33 sites. Mr. Squire, you mentioned that there was a, it seemed like there was some sort of agreement between Peters Broadcasting and the Miller Group before the written subcontractor agreement was finalized. Is that correct? That's your argument? Your Honor, that is correct, because the subcontractor agreement was never consummated. So what were, and I was trying to figure this out from the record, what were the precise terms of that agreement? Your Honor, the terms of the agreement were, because of representations made by the Miller defendants concerning their capabilities, Mr. Peters, in advance of any subcontractor agreement being entered into, permitted the Miller Group to come on basically as his employees under his active supervision, had a subcontractor. So are you saying that the agreement was an employer-employee agreement? That's eventually what occurred. That's what occurred because of the inability to formulate a subcontractor agreement. Mr. Peters had a responsibility under the agreement he reached with Crown Castle to begin work on those 33 sites in May of 2019. But for the fact that he was approached by Miller and told, I can come in here and perform this work, you pay me 90% of what you receive from Crown. So hold on, hold on for a second. I guess this is the first time I'm hearing this concept of an employer-employee agreement. Typically, when you have an employee-employee arrangement, you have, you know, you have W-2s, you have tax forms that are, you know, completed. Were any of those formalities abided by? These would have been 1099 employees, Your Honor. So the reason I'm saying this was an interim arrangement, because at all times there was an effort being made to enter into a subcontractor agreement. The subcontractor agreement was never achieved because Miller refused to enter into the type of agreement that the master services agreement required. So in order to commence work on the sites, Mr. Peters permitted Miller to start working with his crew with the expectation that during this interim period, Miller, that Peters could fulfill his responsibilities under the master services agreement, but he could not let Miller assume the status of a subcontractor because there was no subcontractor agreement that complied with the master terms. So what were the terms of that employer-employee agreement? That he would, that he would bring, I'm sorry, Your Honor. For example, how much did, did, you know, Peters' broadcasting promise to pay Miller? What was Miller exactly, what was the scope of the Miller group's work? I'm thinking for, you know, you need kind of precise terms. What I'm saying, Your Honor, is that Peters retained his position as the controller of work on these sites. The only reason Miller was able to obtain access to the sites to bring people to work on the sites is because they were there under the authority of Peters' broadcasting. Had they been a subcontractor, they would have had independent authority to be at these sites. They never became a subcontractor. So the only reason they could go to these sites was because they were there as independent contractors under the control and active management and supervision of Mr. Peters. Mr. Peters also brought on another individual by the name of Mike Taylor. He wasn't under the umbrella of the Miller defendants. He was separate. So Mike Taylor and all of the Miller folks were working on sales sites under the active contractor agreement. So that meant Mr. Peters was in a position... Was there an agreement between the parties in the event that the subcontractor agreement would not be finalized, that Miller, that Peters' broadcasting would compensate Miller for a certain amount for the work that the Miller people were doing? He compensated them for the work they were doing, and this is where... I'm asking, what were the terms of that compensation? The terms of that compensation was what they worked out orally, Your Honor. And what was that? He paid them $46,000 for the work they did on the first five sites. That's what he paid them. That was based upon his assessment of the quality of what had been done in order to meet the requirements of Miller pending the consummation of a subcontractor agreement. Mr. Peters was under a requirement to work on these sites. He had five sites he had to start working on. He got the master services agreement in May of 2019. He had a duty to start working at that point. He would have had to go out, hire crews, hire individuals to start working, which he was in the process of doing when he was approached by Chris Smith and Mr. Miller. They told him, we can do this. You can take a passive role. Give us 90% of the money, we'll enter into a subcontractor agreement. That didn't occur, so Mr. Peters retained active control over the sites in order to satisfy his duty to Crown Castle and brought them on as independent contractors. What was learned after he did that was that contrary to the representations that were made to him concerning the qualifications of the crews, concerning the source of their resources and concerning what could be done with the money they were paid, it was learned that the Miller defendants were under criminal investigation in Texas, that they had obtained money from a third party by the name of Ms. Joiner to the extent of $700,000 and that all of the equipment and so forth that was brought to the sites, contrary to what Miller represented to Mr. Peters, actually belonged to this third party. Mr. Squire, I guess I'm a bit confused because you're saying that Peters Broadcasting maintained control over these sites as they needed to do under their agreement with Crown Castle. In the end, Crown Castle terminates the agreement or refuses to provide Peters Broadcasting with any more sites because of the faulty workmanship on the sites. Correct. Yet Peters Broadcasting was the one managing the sites and overseeing and supervising, and so to some extent, wasn't it Peter Broadcasting's fault that the work on the sites didn't meet Crown Castle's specifications? It was his fault, Your Honor, because he relied upon the fraudulent and negligent misrepresentations of Miller concerning what their capabilities were. He said he had employees that knew, and he knew from his previous experience with Chris Smith, who brought Miller into Mr. Peters Confidence, who operated a company called Frequency One, Smith represented to Mr. Peters that he knew Miller, that Miller's people were competent, so at that point, instead of going out hiring his own crews, he said, I'll let these guys go in and work. Turns out, they brought in employees who had no experience in telecommunications. They were people brought out of an oil field. Contrary to the representations made to Mr. Peters, the equipment didn't belong to them, and contrary to the representations made to Mr. Peters, Mr. Peters would not have been entitled to any money because all of the money was given to Ms. Joyner, who had given Miller $700,000, and Miller was obligated to turn over 100% of whatever revenue he earned from working on sales sites to Ms. Joyner because he had, in January of 2019, entered into an agreement with her to that effect that was never disclosed to Mr. Peters. So what we're saying, Judge, is that Mr. Peters relied to his detriment, justifiably, on representations made by Mr. Miller that were fraudulent. He never disclosed to Mr. Peters that the trucks, the money, came from a third party that he was obligated to pay 100% of the revenue to, nor that he had people working on these crews that had no competence whatsoever. This is an industry that the reason Mr. Peters got this awarded contract was because of his reputation. Crown Castle just doesn't go around and accord these opportunities to anyone. It takes someone who has a track record in the industry, who has proven their ability to do this type of work, and Mr. Peters had worked 40 years to establish that reputation. He relied to his detriment on the fraudulent representations made by Mr. Miller and Mr. Smith and let those people come in. They never would agree to enter into a subcontracting agreement of the nature that Crown Castle required, and then, without any authority, having failed to perform as they represented, circumvented Mr. Peters, went to Crown Castle and tried to get themselves established as a direct contractor to the detriment of Mr. Peters again without his authority or interest.  Sorry, Your Honor. Thank you. Mr. Simon. Good morning, Your Honor. Mr. Simon, we expect counsel to be at counsel table, not sitting in the audience. I apologize, Your Honor. Good morning, Your Honors. May it please the Court? I'm here on behalf of the Appellees PEM Consulting Group, LLC, Pyramid Consultants and Construction, and Philip Miller. This case involves a cell tower project that occurred in about 2019, and one of the points that a colleague made was that there was no ruling on fraudulent inducement. There was a ruling on that. It was in footnote 9, which, and the ruling is found on pages 13 and 14, but the basis for the court granting summary judgment on that count was that the court did not find that the parties had breached an enforceable agreement, and since there was no enforceable contract, the court granted summary judgment on the fraudulent inducement count. PBE alleges breach of contract, but from the discovery that was taken and included in the record, both parties to this case testified that they never came to an agreement. The district court highlighted this fact. Furthermore, the district court noted that there was a lack of meaning in the minds on reasonable and definite terms for an enforceable contract to exist. It was a case cited in our brief, and it's also cited in the district court opinion that goes to the restatement second of contract, section 33. In order to give effect to a contract, its terms must be reasonably certain. Again, both parties testified they never reached an agreement, and even if they did, there were no clearly marked terms of such an agreement. There was no scope of work articulated in this agreement. There was a suggestion of a 90 percent, 10 percent payment breakdown, but the payment that my colleague mentioned that was ultimately made had deductions for costs that were incurred by PBE, so even that payment did not comply with that 90-10 breakdown, and it was ultimately charged back, so my client never received that payment. So in such, I think it was proper for the district court to grant summary judgment on the breach of contract count. PBE also argues fraud based off statements that Mr. Miller made to Peters, but the record shows that a lot of the statements that Mr. Peters relied on were made by another individual, Chris Smith. He was a third-party contractor. He wasn't an employee of my clients, and he wasn't an employee of Mr. Peters at the time, and so to the extent that Mr. Smith made statements about my client's reputation in the industry, my clients weren't making those statements. To the extent Mr. Miller did make statements to Mr. Peters about the source of his funds, about the equipment, about what he was going to perform on the project, again, those statements were covered in discovery. I was able to produce bank statements from my client showing at the time my client allegedly made those statements. He had about $149,000 in his bank account, so there's just a factual thing that's in the record that's even in the light most favorable to the plaintiff. It shows that my client had funds at the time he allegedly made the statements. Any allegations that my client made about managing the sites, about doing the work, about providing the equipment, were statements about future conduct, which cannot serve as the basis for fraud. And then the timing of the statements is relevant as well. The evidence in the record indicates that there's an allegation that they were basically making the argument that it's kind of after the fact, and it goes to the reliance elements of fraud. At the time these alleged statements were made, the crews had already been out in the field. They already had the equipment on site, and so it defeats the reliance element, and then the question becomes, what conduct did Peters take on behalf of these statements? Well, they never entered into a formal agreement based off these statements. That deal was never consummated. Ultimately, my client walked away from the project at a certain point, cut his losses. At the time he did that, the equipment, the trucks that were provided, were still on site. And so there's an argument that we're making that even if he had made some fraudulent, not fraudulent, but misleading statements, there's no damages based on this equipment that was provided. Finally, the appellant contends that my clients lied to PBE about its intent to subcontract with PBE, and they alleged that my client's intent was really to contract with Crown Castle, who had these cell tower projects. We cited a case in our brief, Jones v. Oakland City University, I think is instructive. It held that fraud cannot be predicated on doing something in the future, although there may be no intention of fulfilling that promise. And so in this case, even if the court finds that my client wanted to contract with Crown Castle, which I think he did, the fact that he ultimately never went through and signed an agreement with PBE is not an indication, that's not actual fraud. He was under no duty to sign a formal subcontract with PBE. He could, he had the freedom to contract, the freedom not to contract. He was under no duty to do that. So it's just our contention that these statements do not arise to fraud. I'll briefly address some of the other arguments in our brief. There's a claim for negligent misrepresentation that was made, but it's our contention that in this case, in Indiana case law, those claims have been traditionally used in an employer-employee relationship or an insurance industry relationship, where there's an advisory role, and the district court declined to expand the scope of that cause of action. And we agree with that finding, and we've included case law in our brief that describes kind of the history of that cause of action in Indiana. There was other arguments made about, in the brief, about unjust enrichment. Ultimately, my client, the question becomes, what benefits was my client conferred from this project? There was a payment of $46,000 that was made to my client. That was ultimately charged back by PBE, so my client never received it. There was another random payment in the record of $6,000 that went from PBE to my clients, but there's no indication in the record that my clients requested those funds. So... Whatever happened to that $6,000? Your Honor, the $6,000 went, it did get transferred to my client. It was in the PEM consulting group, but my client didn't recall it. I asked Mr. Peters, you know, why was that payment made? He had no indication of why that payment was made. There was no indication my client requested that amount. So my client did receive it, but there's no evidence in the record that he requested it. What happened to it? I don't have an answer for you, Your Honor, on that. I don't know what happened to it. It's in the account. It's in the bank statements that it went through, and so my client did receive it. The bank statements also show that my client expended about $36,000 on this project. Counsel, Judge Ripple is not in the screen. You should face the camera. Okay. It's right in front of you. Okay. Thank you, Your Honor. Lastly, there's a torturous interference claim that's being made, and my client did make $36,000 in payments towards this project. At some point, he did reach out to Crown Castle directly, and so there's evidence in the record that he was justified in doing that. He had made the payments where the project hadn't received payments in response. Lastly, there's evidence in the record from Crown Castle that it terminated this contract with PBE based on substandard performance, not on any communication that my client made directly with Crown Castle. And Mr. Peters wasn't privy to any of the communication between my client and Crown Castle. So those are the points. Did Peters Broadcasting receive any funds from Crown Castle as a result of the projects? Yes, Your Honor. Peters Broadcasting received $118,000. For the sites that Miller and his group worked on? Yes, the sites that were completed. And it retained that money. $46,000 of that was sent to my client but ultimately charged back. And so did Peters Broadcasting hire new contractors then for the project after your client left? I'm not aware, Your Honor. I believe what happened is Crown Castle suspended Peters Broadcasting as a contractor. And so Peters just didn't receive any more purchase orders on the project. And so one of the questions we had, I think one of the issues with the breach of contract claim is, what is the scope of the work that was supposed to be performed? My client is saying it was just the work that Peters was awarded. And Peters is saying maybe Peters had a different intention. But there's no meeting of minds on what the scope of work was. So I have nothing further, Your Honors, with that. I will reserve. I have two minutes and 30 seconds left, I see. I don't think I have anything more. I don't want to waste any more time.  Well, thank you very much. Thank you. The case is taken under advisement. Court.